254 May 14, 2015 No. 17

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

EMILIO JUNIOR MEDINA,
*Petitioner on Review.*

(CC CR100685; CA A147883; SC S062436)

En Banc

On review from the Court of Appeals.*

Argued and submitted January 12, 2015.

Zachary Lovett Mazer, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Michael S. Shin, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

KISTLER, J.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court.

_____

 * Appeal from Yamhill County Circuit Court, Ronald W. Stone, Judge. 262 Or App 140, 324 P3d 526.

**KISTLER, J.**

The state charged defendant with identity theft for signing two documents with another person's name. At trial, defendant moved for a judgment of acquittal on the ground that no reasonable person could find that, in signing those documents, he had committed the charged acts. Additionally, defendant argued that, if he had committed those acts, no reasonable person could find that he had done so with the requisite mental state. The trial court denied defendant's motion, convicted him of identity theft, as well as three other charged offenses, and entered judgment accordingly. The Court of Appeals affirmed the trial court's judgment. *State v. Medina*, 262 Or App 140, 148, 324 P3d 526 (2014). Having allowed defendant's petition for review, we now reverse the Court of Appeals decision and the trial court's judgment as to defendant's conviction for identity theft and remand this case to the trial court for further proceedings consistent with this decision.

The parties submitted this case to the trial court on stipulated facts, which consisted primarily of the police report, a signed fingerprint card, and a signed property receipt. The following facts are taken from the police report. After a police officer stopped defendant for speeding, defendant identified himself as Sergio Molina, told the officer his date of birth, and explained that he used to live in Washington. Defendant, however, did not present a driver's license or other type of identification to the officer. The officer called the dispatcher, who could not locate any person named Sergio Molina in either Oregon or Washington. The officer arrested defendant for failure to present a driver's license and took defendant to the local police station.

At the police station, defendant signed two documents—a fingerprint card and a property receipt—as Sergio Molina. Regarding the fingerprint card, the police report states that, after defendant was taken to the police station, he "was fingerprinted." It adds that, "[w]hen [the officer] asked [defendant] to sign the fingerprint card, [defendant] signed it with the name Sergio Molina." Finally, it states that, after defendant signed the card, the officer "faxed [defendant's] fingerprints to AFIS [the Automated

Fingerprint Identification System].''[1] The police report contains no further discussion of the fingerprint card, and it does not mention the property receipt.[2]

After checking the fingerprints on the card, AFIS notified the police department that defendant's name is Emilio Medina, not Sergio Molina. On further questioning, defendant admitted that the name and date of birth that he had given the officer were fictitious. After learning defendant's real name, the officer also discovered that defendant was on probation. He contacted defendant's probation officer, who explained that defendant might have given the officer a fictitious name because he was aware of a warrant for his arrest.

The indictment charged defendant with four offenses, only one of which—identity theft—is at issue here.[3] Regarding that offense, the indictment alleged that defendant "did unlawfully, with the intent to deceive or defraud, utter or convert to defendant's own use personal identification of 'Sergio Molina.'"

Before this case was submitted to the trial court, defendant moved for a judgment of acquittal on the charge of identity theft. He argued that no reasonable trier of fact could find that, in telling the officer his name was Sergio Molina and in signing the fingerprint identification card and property receipt, he had "uttered" or "converted to [his] own use" another person's personal identification. He also argued that no reasonable trier of fact could find that, in using a false name, he had intended to deceive the officer.

---

[1] As noted, the fingerprint card is part of the stipulated record. In addition to the signature "Sergio Molina" on the card, the name Sergio Molina, a date of birth, and a Social Security number are printed on the card. The police report does not state who printed the name and other information on the card; however, the printing appears similar to the officer's.

[2] As noted, the property receipt is part of the stipulated record. The receipt lists five items that the officer took from defendant. Although the police report does not state who printed the items listed on the property receipt, the printing appears similar to the officer's. The signature "Sergio Molina" appears underneath the five listed items. Given the context, the trial court reasonably could have found that defendant signed the property receipt as Sergio Molina.

[3] In addition to identity theft, the indictment charged defendant with two counts of giving false information to a police officer and one count of failing to carry or present a driver's license.

The trial court denied defendant's motion for judgment of acquittal, convicted him of the four charged offenses, and entered judgment accordingly. The Court of Appeals upheld the challenged ruling and, having done so, affirmed the trial court's judgment. We allowed defendant's petition for review.

Before turning to the issues that defendant raises on review, we first set out the text of the identity theft statute, which provides, in part:

> "A person commits the crime of identity theft if the person, with the intent to deceive or to defraud, obtains, possesses, transfers, creates, utters or converts to the person's own use the personal identification of another person."

ORS 165.800(1). The identity theft statute defines the phrases "personal identification" and "another person." "'Personal identification' includes, but is not limited to, any written document or electronic data that does, or purports to, provide information concerning," among other things, a person's name, address, telephone number, Social Security number, or signature. ORS 165.800(4)(b). "'Another person' means an individual, whether living or deceased, [and] an imaginary person ***." ORS 165.800(4)(a).

Given those statutory provisions, the parties agree that the trial court reasonably could have found that the fingerprint identification card and the property receipt constituted the "personal identification of another person." That is, the trial court reasonably could have found that the fingerprint identification card and the property receipt were written documents that provided or purported to provide the personal identification of another person.[4] The parties disagree whether the trial court reasonably could have found either that defendant had the requisite mental state or that, if he did, he committed the charged acts—namely, that he uttered or converted to his own use the fingerprint card or the property receipt.

---

[4] In arguing that the evidence was sufficient to survive a motion for judgment of acquittal, the only "personal identification" that the state has identified are the two documents—the fingerprint card and the property receipt—that defendant signed. It does not argue that some other form of personal information could constitute "personal identification" within the meaning of ORS 165.800(4)(b).

We begin with the issue on which defendant focuses most of his attention on review—whether the trial court reasonably could have found that he acted with "the intent to deceive" when he used a false name to sign the fingerprint card and the property receipt. As we understand defendant's argument on that issue, it runs as follows: When the legislature first enacted the identity theft statute in 1999, that statute did not prohibit giving a false name to a police officer. Defendant grounds that argument textually on the fact that, in 1999, the identity theft statute prohibited engaging in certain acts only with the "intent to defraud" and also on the legislative history of the statute. Defendant argues that an "intent to defraud" means an intent to obtain a financial or material gain by means of a falsehood. He contends that, because giving a false name to the officer was not likely to result in any financial or material gain, the trial court could not infer that he had an intent to defraud.

Defendant acknowledges that the legislature amended the identity theft statute in 2001 to prohibit acting with "intent to deceive," as well as with "intent to defraud." However, he argues that neither the text nor the history of the 2001 amendment necessarily implies that, in adding "intent to deceive," the legislature intended to prohibit giving a false name to an officer. Defendant's argument turns on a question of statutory interpretation, and we look to the text, context, and history of the identity theft statute to resolve his claim. *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (stating that order of analysis).

ORS 165.800 prohibits committing certain acts "with the intent to deceive," as well as the intent to defraud. Because the identity theft statute does not define "deceive," we consider initially the ordinary meaning of that word. *See State v. Ziska/Garza*, 355 Or 799, 804-05, 334 P3d 964 (2014) (so stating). *Webster's Dictionary* provides that "deceive" means "to cause to believe the false **:** DELUDE <when we're young we can be very easily *deceived*—George Meredith>." *Webster's Third New Int'l Dictionary* 584 (unabridged ed 2002) (italics in original). The ordinary meaning of "deceive" is at odds with defendant's argument. The trial court reasonably could have found that, in signing the fingerprint card and property receipt with a fictitious name, defendant

intended to deceive the officer; that is, the trial court reasonably could have found that defendant intended "to cause [the police officer] to believe [something that was] false"—that his name was Sergio Molina.

Defendant argues, however, that the context leads to a more restrictive understanding of the phrase "intent to deceive." He notes that the identity theft statute includes affirmative defenses for underage persons who use someone else's personal identification either to purchase alcohol and tobacco or to enter a place that, as a result of their age, is off-limits.[5] Defendant infers from those defenses and from the gestalt of the identity theft statute that the deceptive intent that the identity theft statute requires should not be understood as "deception for the sake of deception itself." Rather, defendant argues, the identity theft statute should be understood as prohibiting deception for the purpose of gaining a benefit or advantage to which a person is not entitled. Even if the interpretation that defendant urges is correct, that does not advance his position. In this case, the trial court reasonably could have found that defendant used a fictitious name to obtain an unwarranted advantage—specifically, the court reasonably could have found that defendant used a fictitious name to avoid being arrested on a warrant.

Neither the text nor the context of the identity theft statute supports defendant's position, and we turn to the legislative history of that statute, on which defendant's argument primarily rests. As initially proposed in 1999, House

---

[5] ORS 165.800(3) provides:

"It is an affirmative defense to violating [ORS 165.800(1)] that the person charged with the offense:

"(a) Was under 21 years of age at the time of committing the offense and the person used the personal identification of another person solely for the purpose of purchasing alcohol;

"(b) Was under 18 years of age at the time of committing the offense and the person used the personal identification of another person solely for the purpose of purchasing tobacco products; or

"(c) Used the personal identification of another person solely for the purpose of misrepresenting the person's age to gain access to a:

"(A)  Place the access to which is restricted based on age; or

"(B)  Benefit based on age."

Bill (HB) 2623 prohibited identity theft, but was relatively narrow. *See* Bill File, HB 2623, Feb 12, 1999 (setting out the bill). Specifically, HB 2623 provided that a person commits the crime of identity theft if the person intentionally (1) "[r]epresents that the person is another person" and (2) "[u]ses or attempts to use" the other person's "personal identifying information or personal identification document *** to obtain anything of value." *Id.*

Approximately two months after HB 2623 was introduced, the House Judiciary Criminal Law Committee engaged in a practice that colloquially is known as "gutting and stuffing." The committee "gutted" another bill (HB 3057) and "stuffed" that bill with the substance of HB 2623.[6] Tape Recording, House Judiciary Criminal Law Committee, HB 3057, May 4, 1999, Tape 179, Side A (statement of committee counsel). HB 3057, as amended, provided, in part:

> "(1) A person commits the crime of identity theft if the person, with the intent:
>
> "(a) To defraud, obtains, possesses, transfers, creates, utters or converts to the person's own use the personal identification of another person; or
>
> "(b) Of representing to a peace officer lawfully performing the officer's duties or to a judge that the person is another person, obtains, possesses, transfers, creates, utters or converts to the person's own use the personal identification of another person."

Bill File, HB 3057, May 13, 1999.

The text of HB 3057, as amended, differed from the text of HB 2623 in two respects: the prohibited acts and the prohibited mental state. Regarding the prohibited acts, HB 2623 would have prohibited persons from "representing" that they were someone else and "using" that person's personal identification information and documents. HB 3057, as amended, replaced "represent" and "use" with multiple verbs. Specifically, HB 3057, as amended, made it a crime to

---

[6] Frequently, gutting and stuffing occurs to take advantage of a favorable relating clause in the gutted bill. This case was no exception. Tape Recording, House Judiciary Criminal Law Committee, HB 3057, May 4, 1999, Tape 179, Side A (statement of committee counsel) (explaining the procedure).

"obtain," "possess," "transfer," "create," "utter," and "convert to the person's own use" another person's personal identification. The legislative history contains no explanation for that change or what the committee understood those different terms would prohibit.

HB 3057, as amended, also added an additional mental state to HB 2623. While HB 2623 had prohibited misrepresenting a person's identity "to obtain anything of value," HB 3057, as amended, prohibited engaging in the acts listed above either with the intent "[t]o defraud" or with the intent "[o]f representing to a peace officer lawfully performing the officer's duties or to a judge that the person is another person." The first mental state in HB 3057, as amended, did not reflect a significant change from HB 2623. The intent to defraud in HB 3057, as amended, was comparable to the intent in HB 2623 "to obtain [some]thing of value" by misrepresenting a person's identity. HB 3057, as amended, however, would have added another prohibited intent; it would have made it a crime to obtain, possess, transfer, create, utter, or convert to the person's own use another person's personal identification "with the intent * * * [o]f representing to a peace officer * * * or to a judge that the person is another person."

As defendant notes, the House Judiciary Criminal Law Committee voted to criminalize engaging in the listed acts with either mental state. However, the Ways and Means Subcommittee on Public Safety later amended HB 3057 to omit the second mental state (the intent to misrepresent the person's identity to a police officer or judge), to reduce the bill's fiscal impact. Tape Recording, Ways and Means Committee, Subcommittee on Public Safety, HB 3057, July 1, 1999, Tape 171, Side A. The House and the Senate concurred in the bill, as amended in Ways and Means, and the Governor signed it.

As enacted in 1999, the identity theft statute provided:

"A person commits the crime of identity theft if the person, with the intent to defraud, obtains, possesses, transfers, creates, utters or converts to the person's own use the personal identification of another person."

Or Laws 1999, ch 1022, § 1. Defendant infers from the inclusion of one mental state (an intent to defraud) in the 1999 statute and the omission of the other (an intent to misrepresent the person's identity to a peace officer or judge) that misrepresenting his identity to the police officer in this case would not have constituted identity theft under the 1999 identity theft statute.

        The state does not dispute that proposition. Rather, it notes that the 2001 legislature made the listed acts criminal if committed "with the intent to deceive," as well as "with the intent *** to defraud." *See* Or Laws 2001, ch 870, § 3. The state argues that the 2001 amendment broadened the scope of the identity theft statute so that an intent to misrepresent a person's identity to a police officer could constitute an "intent to deceive" within the meaning of the statute. Defendant responds that it does not necessarily follow that, in adding the phrase, an "intent to deceive," the 2001 legislature intended to depart from the 1999 legislature's understanding that the identity theft statute did not prohibit giving a false name to a police officer. *See Fifth Avenue Corp. v. Washington Co.*, 282 Or 591, 597-98, 581 P2d 50 (1978) (observing that amendments that materially change the terms of an earlier statute change the statute's meaning to the extent the change "is expressly declared or necessarily implied").

        In our view, the state has the better of the argument. As explained above, the 2001 legislature added a phrase—the intent to deceive—to the identity theft statute that, by its plain terms, includes misrepresenting a person's identity to a police officer to obtain an unwarranted advantage. Even if an "intent to defraud" would not have included that misrepresentation, an "intent to deceive" does. It necessarily follows, from the text of the 2001 amendment alone, that the legislature intended the identity theft statute, as amended, to reach the sort of misrepresentation that is at issue in this case. *Cf. State v. Ofodrinwa*, 353 Or 507, 529-30, 300 P3d 154 (2013) (adding an affirmative defense based on the defendant and victim's relative ages necessarily implied that the legislature's use of the phrase "does not consent" in an earlier version of the statute included lack of consent due to the victim's age). We would have to disregard

the ordinary meaning of the words that the 2001 legislature added to reach a contrary conclusion.

The legislative history of the 2001 amendment points in the same direction. The amendment originated in the Senate Judiciary Committee. The committee added the amendment to an omnibus crime bill, which had begun in the House. *See* Bill File, HB 2918, May 31, 2001. Counsel to the Senate Judiciary Committee explained the reason for the amendment:

> "Section 3 of the [A-Engrossed House] bill adds the language 'with the intent to deceive or defraud' to the identity theft statute. *** This was done because—to make clear to judges, prosecutors, and defense attorneys that there need not be a deception with the use [of] identity theft, there need not be a purpose to get pecuniary gain or financial gain but any deception is enough to satisfy the intent on that law."

Tape Recording, Senate Judiciary Committee, HB 2918, May 16, 2001, Tape 144, Side B. Later, Senator Brown told the Ways and Means Committee that the amendment "expands the crime of identity theft." Tape Recording, Ways and Means Committee, HB 2918, July 4, 2001, Tape 75, Side A. She told the full Senate the same thing a day later, and the Senate passed the bill, as amended. Tape Recording, Senate Floor Debate, HB 2918, July 5, 2001, Tape 277, Side B. The House concurred in the bill, as amended. Tape Recording, House Floor Debate, HB 2918, July 5, 2001, Tape 240, Side A.

The legislative history of the 2001 amendment makes clear that the legislature understood that, in adding "intent to deceive," it was expanding the reach of the identity theft statute. The statute, as amended, was not limited to an intent to defraud (to obtain a "pecuniary gain or financial gain") but applied to deception for the purpose of obtaining any unwarranted advantage. It follows from both the text of that amendment and its legislative history that the statute, as amended, applies to misrepresenting a person's identity to an officer to gain an unwarranted advantage. In this case, the trial court reasonably could find that defendant had an intent to deceive, within the meaning of the

identity theft statute, when he used Sergio Molina's name to avoid being arrested on a warrant.

Defendant raises a second issue on review. He argues that the trial court could not reasonably find that he committed the charged acts—namely that he "uttered" or "converted to [his] own use" the personal identification of another person. Defendant's argument turns, initially, on the meaning of those statutory terms, and we begin with the meaning of "utter." Because "utter" is not a defined term for the purposes of the identity theft statute, we look initially to its ordinary meaning. *See Ziska/Garza*, 355 Or at 804-05. *Webster's* identifies multiple senses for "utter." *Webster's* at 2526. The sense that, in context, comes closest to the legislature's use of that word in the identity theft statute is: "to put (as notes or currency) into circulation; *specif* **:** to circulate (as a forged or counterfeit note) as if legal or genuine." *Id.*

In addition to a statute's text, we also consider its context, which includes the common law and the statutory framework within which the law was enacted. *Stevens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004). Two related but separate common-law crimes provide relevant context: forgery and uttering a forged instrument. At common law, a person committed the crime of forgery if, with an intent to defraud, the person falsely made or materially altered a written instrument that, if genuine, had apparent legal effect. Charles E. Toscia, 4 *Wharton's Criminal Law* § 476 (15th ed 1996). The common law also made it a crime for a person to utter a forged instrument, knowing it to be forged, with the intent to defraud. *Id.* § 494. At common law, "[a] forged instrument [wa]s uttered when it [wa]s offered to another as genuine, without regard to whether it [wa]s so accepted." *Id.* § 496.

In 1971, Oregon grouped those two common-law crimes under the single rubric of "forgery." *See* Or Laws 1971, ch 743, § 152 (defining alternate ways of committing second-degree forgery). ORS 165.007(1)(a) provides that a person commits the crime of second-degree forgery if, with the requisite intent, the person "[f]alsely makes, completes or alters a written instrument." ORS 165.007(1)(b) provides that a person commits the crime of second-degree forgery

if, with the requisite intent, the person "[u]tters a written instrument which the person knows to be forged." "Utter" is a defined term for the purposes of the forgery statute. ORS 165.002(7). It "means to issue, deliver, publish, circulate, disseminate, transfer or tender a written instrument or other object to another." *Id*.

Considering the text and context of the identity theft statute, we conclude that the 1999 legislature used the word "utter" in the same sense that it had used it in the forgery statute.[7] *See State v. Cloutier*, 351 Or 68, 99, 261 P3d 1234 (2011) (explaining that "we ordinarily assume that the legislature uses terms in related statutes consistently"). To establish that defendant "uttered" the fingerprint identification card or the property receipt, the state had to prove that defendant was the person who "issue[d], deliver[ed], publish[ed], circulate[d], disseminate[d], transferr[ed] or tender[ed]" one or both of those documents. *See* ORS 165.002(7) (defining "utter" for the purposes of the forgery statute).

In this case, all that the stipulated record reveals is that, after defendant was arrested and taken to the police station, he "was fingerprinted," the officer "asked him to sign the fingerprint card," and defendant did so. There is no evidence that defendant filled out the fingerprint card or the property receipt or that he offered or tendered either of those documents to the police.[8] Rather, all the record shows is that defendant falsely signed two documents that government officials created for their own use and that they tendered to defendant for his signature.

The fact that defendant falsely signed the two documents does not mean that he uttered them. The law has long distinguished between forging a document by falsely signing it and uttering a forged document. Nor does the

---

[7] The legislative history is silent on the meaning of "utter" and "convert to the person's own use." As discussed above, when the House Judiciary Criminal Law Committee expanded the list of prohibited acts in the identity theft statute to include "uttering" and "converting to the person's own use," no one discussed what those terms meant.

[8] As noted, the printing on the two documents appears consistent with the officer's printing, and the state acknowledges in its brief on the merits that "[j]ail officials created the fingerprint card and property receipt, both of which included [the name] 'Sergio Molina' and a date of birth."

context in which these documents were created and signed give rise to a reasonable inference that defendant uttered them. In reaching that conclusion, we do not foreclose the possibility that a defendant could "utter" a document that he or she asked another person to create and disseminate. A defendant, for example, might ask a bank teller to draw a counter check on an account. The defendant might then forge the account holder's name on the check and expressly or impliedly direct the teller to circulate the signed check. In that instance, a trial court reasonably could infer that the defendant, in asking the bank teller to draw and circulate the check, had "uttered" it through an agent. In this case, there is no evidence that defendant asked the officer to create the fingerprint card and the property receipt, nor is there any evidence that defendant expressly or impliedly directed the officer to circulate the fingerprint card. There is, in short, no evidence from which the trial court could have inferred that the officer was acting as defendant's agent.

To be sure, defendant may have been guilty of forgery for falsely signing or completing the fingerprint card and the property receipt. *See* ORS 165.007(1)(a) (prohibiting falsely making, completing, or altering a written instrument). He also may have been guilty of identity theft for falsely "creating" the personal identification of another. *See* ORS 165.800(1) (prohibiting, among other things, creating another person's personal identification). The state, however, did not charge defendant with either forgery or creating another person's personal identification. Rather, it charged him with "uttering" another person's personal identification. The state is limited to the substantive allegations in the indictment. *State v. Wimber*, 315 Or 103, 113-14, 843 P2d 424 (1992); *De Jonge v. Oregon*, 299 US 353, 362-63, 57 S Ct 255, 81 L Ed 278 (1937). The trial court could not reasonably find on this record that defendant "uttered" either the fingerprint card or the property receipt.

The indictment also alleged that defendant "convert[ed] to [his] own use" the personal identification of Sergio Molina. As with "utter," the identity theft statute does not define the phrase "converts to the person's own use," and the dictionary contains multiple senses of the words used in

that phrase. *See Webster's* at 499 (convert); *id.* at 2523 (use). The sense of convert that, in context, comes closest to that word's use in the identity theft statute is: "to appropriate dishonestly or illegally <~ *ing* to its own . . . use 80,000 bushels of corn stored for the Commodity Credit Corp.—*Time* >" *Id.* at 499 (ellipses in original).

In addition to the text of the statute, we also consider the statute's context, which includes the common law and the statutory framework within which the law was enacted. *Stevens*, 336 Or at 401. As explained below, in much the same way that "utter" is an element of the crime of forgery, the phrase "converts to the person's own use" has been an element of the crimes of larceny by trick and embezzlement. In seeking to determine the meaning of that phrase, we first discuss those crimes. We then trace briefly the phrase's use in Oregon's statutes before the legislature revised the Oregon criminal code in 1971.

At common law, a person committed larceny by taking property from another's possession without his or her consent. Wayne R. LaFave and Austin W. Scott, Jr., *Handbook on Criminal Law* 618 (1972). That definition proved incomplete, however, because there are multiple ways in which a person can come into possession of property with the possessor's consent but still misappropriate the property. Two of those ways are relevant here: larceny by trick and embezzlement.

In larceny by trick, "[a] wrongdoer obtains possession of (but not title to) another's property by telling him lies, intending to misappropriate the property and, at the earliest instance, doing so." *Id.* at 620. In that crime, the defendant does not obtain possession of the property honestly, but that fact alone is not sufficient to prove the crime of larceny by trick. The wrongdoer also must convert the property to his or her own use. *Id.* at 627; *see Skantze v. United States*, 288 F2d 416, 418 (DC Cir 1961) (observing that a defendant who obtained his superiors' signatures on checks by telling them that the money was needed to replenish the embassy's cash account "not only intended [to take his employer's money], he consummated his purpose and actually converted the money to his own use").

In embezzlement, a defendant is lawfully in possession of property but fraudulently converts it to the defendant's own use.[9] LaFave and Scott explain that, even though "[e]mbezzlement statutes often are worded in terms of the wrongdoer's conversion 'to his own use,'" those words should not be taken literally. *Handbook on Criminal Law* at 645. A defendant need not personally benefit from the conversion. It is sufficient if the defendant converts another's property, for example, "to benefit the corporation of which he is an officer or a stockholder, or to benefit his wife or son." *Id.* at 645-46. According to LaFave and Scott, a "conversion of property requires a serious act of interference with the owner's rights." *Id.* at 645. Moving the property a short distance or using it casually is not enough. *Id.* However, "using [the property] up, selling it, pledging it, giving it away, delivering it to one not entitled to it, inflicting serious damage to it, [or] claiming it against the owner" will constitute conversion. *Id.*

Before the enactment of the Oregon Criminal Code of 1971, the Oregon statutes paralleled the common law; that is, they distinguished among larceny, embezzlement, and similar property crimes. *See* Ridgway K. Foley, Jr., *Larceny, Embezzlement, and False Pretenses*, 41 Or L Rev 242, 250-52 (1962) (detailing multiple statutory provisions punishing related but separate forms of theft).[10] Before 1971, a person committed larceny by willfully taking the property of another with the intent to deprive that person of the property permanently. *Former* ORS 164.310 (1961).[11] By contrast,

---

[9]  Unlike larceny by trick, embezzlement is not a common law crime. Rather, the English legislature created the crime of embezzlement to fill a gap in the common law crime of larceny. *Handbook on Criminal Law* at 644.

[10]  The drafters of the 1971 Criminal Code sought to eliminate "the confusing distinctions between larceny, larceny by trick, embezzlement, obtaining under false pretenses, *etc.*" that previously existed in Oregon's criminal statutes. Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report §122 (July 1970). Accordingly, in 1971, the legislature repealed the various larceny and embezzlement statutes discussed in the text and replaced them with the crime of theft. *See* Or Laws 1971, ch 743, §§ 122, 432.

[11]  Before 1971, the legislature prohibited various types of larceny, such as larceny in a boat, larceny in a motor vehicle, and larceny of harvested and threshed grain. *See former* ORS 164.320 (1961) (boat); *former* ORS 164.330 (1961) (motor vehicle); *former* ORS 164.350 (1961) (harvested and threshed grain). Each type of larceny followed the same pattern as the generic crime of larceny discussed in the text: Each required a taking and an intent to deprive.

before 1971, a person committed embezzlement when the person obtained possession of property lawfully and then "embezzle[d] or fraudulently convert[ed the property] to his own use." *See former* ORS 165.005 (1961) (embezzlement by employees acting as fiduciaries).[12] In 1971, the legislature repealed the various forms of larceny and embezzlement and replaced them with the offense of theft. *See* Or Laws 1971, ch 743, § 432 (repealing larceny and embezzlement statutes); *id.* § 122 (explaining that, except for theft by extortion, «conduct denominated theft under this section 123 of this [1971] Act constitutes a single offense»).

In prohibiting a person from "convert[ing] to the person's own use" another person's personal identification, Oregon's identity theft statute harkens back to the pre-1971 embezzlement statutes. The use of that phrase in the identity theft statute gives rise to two competing inferences. On the one hand, the phrase could suggest that the 1999 legislature intended to revive the distinction between embezzlement and larceny so that the statutory prohibition against converting another person's personal identification to the defendant's own use would apply only when the defendant came into possession of the personal identification lawfully. On the other hand, the Oregon courts had reiterated before 1971 that the distinction between larceny and embezzlement—whether property came into the defendant's hands lawfully or not—"serve[d] no purpose whatsoever." *See, e.g.*, *State v. Harris*, 246 Or 617, 618, 427 P2d 107 (1967). And it may be that, in using that phrase, the 1999 legislature did not intend to reintroduce into the criminal law the arcane common-law distinction that the 1971 legislature had sought to eliminate.

_____

[12] As with larceny, before 1971, the legislature prohibited various types of embezzlement. *See*, *e.g.*, *former* ORS 165.010 (1961) (embezzlement by bailee); *former* ORS 165.025 (1961) (embezzlement by trustee); *former* ORS 165.425 (1961) (embezzlement by goat, sheep, cattle, and horse herders of animals entrusted to their care). Each of those embezzlement statutes prohibited persons who lawfully obtained possession of property from converting that property to their own use. Except for a brief period, Oregon did not expressly codify the common-law crime of larceny by trick. *See Lilly v. Gladden*, 220 Or 84, 90-93, 348 P2d 1 (1960) (explaining that a 1957 amendment to larceny explicitly codified larceny by trick); Foley, *Larceny, Embezzlement, and False Pretenses*, 41 Or L Rev at 248-49 (noting that the 1957 amendment was repealed a few years after it was enacted).

Without some greater indication than the legislative history of the 1999 identity theft statute reveals, we hesitate to conclude that, in using the phrase "converts to the person's own use," the 1999 legislature intended to require proof that the defendant had obtained possession of another person's personal identification lawfully. Rather, the phrase more properly is understood as implying that to convert another person's personal identification to his or her own use, a defendant must take, appropriate, or somehow divest the other person of their personal identification and, with the requisite intent, use that personal identification for the defendant's own purposes.

With that understanding of the phrase in mind, we turn to the facts of this case. As noted, the state argues that defendant converted to his own use two written documents: the fingerprint identification card and the property receipt.[13] As also noted, all that the record shows in this case is that defendant used a false name to sign those two documents, which the officer had tendered to him. In falsely signing those two documents, defendant did not take, divest, or somehow appropriate the documents. In short, the trial court could not reasonably find that defendant converted either of those documents, as that term is ordinarily understood.

As discussed above, it may be that, in signing those documents with a false name, defendant was guilty either of forgery for falsely completing a written instrument or of identity theft for falsely "creating" another person's personal identification. The state, however, charged defendant only with converting another person's personal identification to his own use. For the reasons stated above, the trial court could not reasonably find that defendant committed that act.

The trial court should have granted defendant's motion for judgment of acquittal on the charge of identity

---

[13] In arguing that defendant converted another person's "personal identification," the state has argued only that the "personal identification" that defendant converted consisted of two written documents—the fingerprint card and the property receipt. We limit our decision to the argument that the state has raised and express no opinion on whether the statutory phrase "personal identification" could include other forms of personal information.

theft because defendant did not utter the fingerprint card and property receipt nor did he convert those documents to his own use. We accordingly reverse the Court of Appeals decision to the extent that it upheld defendant's conviction for identity theft. Similarly, we reverse the trial court's judgment regarding the conviction for identity theft, affirm its judgment regarding the three other convictions, and remand this case to the trial court so that it can modify the judgment consistently with this decision.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court.