Argued and submitted March 28, conviction for identity theft reversed; remanded for resentencing; otherwise affirmed August 17, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JACOB THOMAS RITTER,
*Defendant-Appellant.*

Marion County Circuit Court
14C42683, 14C44812;
A157651 (Control), A157652

380 P3d 1160

Jamese Lou Rhoades, Judge.

Neil F. Byl, Deputy Public Defender, argued the cause for appellant. With him on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Michael S. Shin, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F.

Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Before Armstrong, Presiding Judge, and Egan, Judge, and Shorr, Judge.

## SHORR, J.

Defendant appeals a judgment of conviction for multiple charges, including one count of identity theft, ORS 165.800. Defendant assigns error only to the trial court's denial of his motion for judgment of acquittal on the identity theft charge. ORS 165.800(1) states, in part, that a person commits identity theft when he or she "converts to the person's own use the personal identification of another person." While in custody at the Marion County Jail, defendant had his cellmate place a call to defendant's girlfriend, whom defendant was prohibited from contacting. The jail's telephone system required the cellmate to use a personal identification number (PIN) to make the call. After the cellmate entered his PIN, called defendant's girlfriend, and spoke briefly with her, the cellmate voluntarily handed the telephone to defendant. Based on that telephone call, defendant was convicted of identity theft on the ground that he had converted his cellmate's personal identification to his own use. On appeal, defendant argues that, by simply taking the telephone from his cellmate, defendant did not "convert[ ] to [his] own use the personal identification of another person." ORS 165.800(1). We agree with defendant and, therefore, reverse his conviction for identity theft.

We state the facts in the light most favorable to the state. *State v. Langley*, 314 Or 247, 249, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993). At the Marion County Jail, where defendant was in custody on domestic violence charges, inmate telephone calls are monitored, logged, and recorded by a telephone system administered by the private contractor Telmate. Inmates may set up an account through Telmate, and friends and family can deposit money or assign credit cards to pay for the inmate's calls. The system features a two-step security process that inmates must complete before making a call. An inmate must first enter his or her unique PIN, which is assigned when the inmate is initially booked into jail. The inmate must then speak a voice password into the telephone, and the system's voice recognition feature compares the spoken password with a recording that the inmate previously made. If the voices match, then the call proceeds; if they do not, the

call is ended. Once the PIN and voice password are entered, there is no further verification or voice matching.

Inmates are prohibited by jail policy from attempting to evade the telephone system's controls. The jail's "Inmate Handbook," which is provided to every person booked into the Marion County Jail, states that unauthorized telephone use, including "using another inmate's pin, using another inmate to make calls or any other activity that circumvents the phone system," constitutes a rule violation, and can result in a variety of sanctions enforced by the jail. Additionally, a set of telephone rules are posted by the jail's telephones, which state, "Use of another inmate's PIN is identity theft," and, in larger font, "WARNING: STEALING ANOTHER INMATE'S PIN IS IDENTITY THEFT."

In violation of those rules, defendant enlisted the help of his cellmate to place a call to defendant's girlfriend, C. Defendant was prohibited by court order from having any contact with C, because she was the victim in defendant's pending domestic violence charges. On July 27, 2014, the cellmate entered his own PIN, dialed C's telephone number, and, when C answered, the cellmate told her, "Hold on a sec, ok? * * * Don't fuck it up though, okay? Please." Defendant then took the telephone and spoke with C for approximately 20 minutes.

Based on that call, defendant was charged with identity theft and found in contempt of court for violating his no-contact order by talking to C. The identity theft charge was consolidated with the pending domestic violence charges, and other charges, and tried in a bench trial. The state submitted a recording of the telephone call into evidence during the trial, and called C as a witness, but did not call defendant's cellmate. Regarding the telephone call at issue here, C testified only that she had received a call from defendant, and that, in her experience, the jail's telephone system usually identifies the name of the caller, but in this case, "[i]t wasn't anybody's name. It just came over like a prepaid account[,]" without identifying who was on the line. The state also called an employee at the Marion County Jail who described the features and operations of the jail's telephone system, as detailed above.

At the close of the state's case, defendant moved for a judgment of acquittal, arguing that he "could not have obtained, possessed, or converted [the cellmate's] personal identification number" because "the actual phone call itself was made, apparently, by [the cellmate]." The state responded that "defendant is circumventing their jailhouse rules, their Telmate rules, using someone else's pin number in order to essentially try to have secret contact with the victim." The state further argued that "it is not the State's position that [the cellmate] is the victim" of the identity theft, but rather that "[t]he victim [of the identity theft] would be the jail and Telmate," and that defendant "convert[ed] * * * [the cellmate's] pin number for his own use to contact [his girlfriend], which he is prohibited from doing." The trial court denied defendant's motion. At the close of trial, defendant again argued to the trial court that the state presented insufficient evidence to convict defendant of identity theft. The trial court denied defendant's renewed motion, concluding that defendant "used and converted another person's personal identification to his own purpose," and did so with the intent "to deceive and defraud * * * with regard to the rules of the jail."

On appeal, defendant renews his argument made in the trial court that, in taking over the telephone call that the cellmate made with the cellmate's own PIN, defendant did not convert that PIN to his own use, and, accordingly, the state presented insufficient evidence of that element of identity theft. The state, however, contends that the cellmate's PIN provided ongoing authorization for the call and, when defendant took over the call, defendant took over use of the PIN. Therefore, the state argues, there was evidence from which the trial court reasonably could have found that defendant converted the PIN to his own use.

The parties' arguments raise a question of statutory interpretation: whether the legislature intended the phrase "converts to the person's own use" in ORS 165.800 to reach defendant's conduct here.[1] Where a trial court's denial of a

---

[1] Though defendant was charged in the indictment with having "obtain[ed], possess[ed], or convert[ed] to the defendant's own use, personal identification of another," the state argued below only that defendant "convert[ed] * * * [the cellmate's] pin number for his own use," and the trial court denied defendant's motion

motion for judgment of acquittal involves a question of statutory interpretation, we review that interpretation for legal error. *State v. Bordeaux*, 220 Or App 165, 170, 185 P3d 524 (2008). We discern the legislature's intention by considering the statute's text and context, and any helpful legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). Ultimately, we review the trial court's denial of a motion for judgment of acquittal to determine whether, after viewing the facts in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *State v. Jackson*, 212 Or App 51, 53, 157 P3d 239, *rev den*, 343 Or 206 (2007).

We begin our analysis with the statute's text. Oregon's identity theft statute states that "[a] person commits the crime of identity theft if the person, with the intent to deceive or to defraud, obtains, possesses, transfers, creates, utters *or converts to the person's own use* the personal identification of another person." ORS 165.800(1) (emphasis added). The statute defines "personal identification" to include "any written document or electronic data that does, or purports to, provide information concerning * * * [a] person's personal identification number." ORS 165.800(4)(b)(M). Accordingly, and as neither party disputes, the cellmate's PIN is "personal identification" for the purposes of identity theft.

As noted, the parties' arguments focus on the narrow issue of whether, by taking over the telephone call that the cellmate made using his own PIN, defendant converted that PIN to his own use. The term "converts to the person's own use" is not defined in ORS 165.800. However, the Supreme Court construed that phrase in *State v. Medina*, 357 Or 254, 271, 355 P3d 108 (2015), concluding that, "to convert another person's personal identification to his or her own use, a defendant must *take, appropriate, or somehow divest* the other person of their personal identification and, with the requisite intent, use that personal identification for

---

for a judgment of acquittal on the ground that defendant "converted another person's personal identification to his own purpose." The state raises no arguments on appeal that defendant somehow obtained or possessed the cellmate's PIN, and "confines its arguments" to whether defendant converted the PIN to his own use.

the defendant's own purposes." (Emphasis added.) *See State v. McAnulty*, 356 Or 432, 441, 338 P3d 653 (2014), *cert den*, ___ US ___, 136 S Ct 34 (2015) (in examining a statute's text in context, "[w]e also consider [the Supreme Court's] prior construction of the statutes at issue"). In light of that interpretation, the state makes no argument that defendant "t[ook]" or "somehow divest[ed]" his cellmate's PIN. Rather, both parties' arguments share the same narrow focus: whether defendant "appropriated" the cellmate's PIN.

The Supreme Court did not further explain what it meant by "appropriate." However, the word is a term of common usage and so we look first to its plain meaning. As reflected in dictionary definitions, "to appropriate" can mean "to claim or use as if by an exclusive or preeminent right," or "to take without permission: PILFER, PURLOIN." *Webster's Third New Int'l Dictionary* 106 (unabridged ed 2002); *see State v. Newman*, 353 Or 632, 641, 302 P3d 435 (2013) (resorting to dictionary definition for guidance in interpreting a "word of common usage"). *Webster's* further explains that the term "signifies more generally to take over or acquire without authority or with questionable authority, usu. also implying a conversion to one's own use of the thing taken over[.]" *Webster's* at 106.

The word "appropriate" is also used in a similar sense in a related statute—theft, ORS 164.015. *See State v. Klein*, 352 Or 302, 309, 283 P3d 350 (2012) (a statute's context includes related statutes). ORS 164.015 states, in part, that the crime of theft can be committed "when, with intent *** to appropriate property to the person or to a third person, the person: (1) Takes, appropriates, obtains or withholds such property from an owner thereof[.]" The corresponding definitional provision, ORS 164.005(1), which sets out definitions for Oregon's property crime statutes, states that to "appropriate" means, as relevant here, to "[e]xercise control over property of another, *** permanently or for so extended a period or under such circumstances as to acquire the major portion of the economic value or benefit of such property[.]" ORS 164.005(1)(a).

Based on the foregoing, we conclude that, to "appropriate" the personal identification of another person for the

purpose of converting that personal identification to defendant's own use, and thereby committing identity theft, a defendant must take, acquire, or claim the personal identification of another person either by possessing or exercising some control over it. We further conclude, as explained below, that the phrase "converts to the person's own use," and, by inclusion, the term "appropriates," must be construed to mean that the act is done without the permission or consent of the person identified by the personal identification.

In *Medina*, the Supreme Court explained that, historically, "the phrase 'converts to the person's own use' has been an element of the crimes of larceny by trick and embezzlement," both of which are crimes of theft. 357 Or at 268; *see also id.* at 269 (explaining that, in 1971, "the legislature repealed the various forms of larceny and embezzlement and replaced them with the offense of theft"). The difference between larceny by trick and embezzlement was how the defendant first came into possession of the property at issue—larceny by trick required that the defendant have come into possession of the property by deceit, while embezzlement applied where the defendant's initial possession was lawful and honest. *Id.* at 268-69. The common element of the two crimes, and the one at issue in ORS 165.800, was the subsequent "conversion" of the property to the person's own use. *Id.*

> "'[C]onversion of property requires a serious act of interference with the owner's rights.' Moving the property a short distance or using it casually is not enough. However, 'using the property up, selling it, pledging it, giving it away, delivering it to one not entitled to it, inflicting serious damage to it, or claiming it against the owner' will constitute conversion."

*Id.* at 269 (internal citations and brackets omitted; quoting Wayne R. LaFave and Austin W. Scott, Jr., *Handbook on Criminal Law* 645 (1972)).

Given that context, and that the crime at issue is, after all, identity *theft*, it follows that a defendant does not "convert[ ] to the person's own use the personal identification of another person" when that personal identification is used with the consent or permission of the individual whom

it identifies. Otherwise, no identity has been *stolen* through the defendant's act. *Cf. State v. Zibulsky*, 266 Or App 633, 638-39, 338 P3d 750 (2014) (stating that "the gravamen of the crime of 'identity theft' is the improper use by one person of 'another person's' *identity*" (emphasis in original), and that "it is apparent in the statute's text what type of act the legislature intended to prohibit: the act of passing one's self off as 'another person' through the use of a nonexclusive list of 'personal information'"); *State v. Mullen*, 245 Or App 671, 679, 263 P3d 1146 (2011), *rev den*, 352 Or 25 (2012) (stating that "legislative history suggests that the identity theft statute is concerned with the misappropriation of persons' identities for the purpose of financial or pecuniary gain" and concluding that the person identified by such personal identification "is subjected to the risk of loss as a result of that misappropriation" and, therefore, "is a victim of the crime").

Turning to the facts of the present case, we conclude that the record contains no evidence from which a rational trier of fact could find that defendant "appropriated" his cellmate's PIN. The record shows that the PIN at issue here was assigned to the cellmate, and, within the Telmate system, functioned to identify the cellmate and enable him to place calls.[2] The evidence in the record supports only the inference that defendant's cellmate willingly helped defendant by providing him with access to the telephone call that the cellmate himself made using his own PIN. The record contains no evidence that defendant took or acquired the cellmate's PIN, claimed the PIN as his own, or ever possessed or exercised any control over the PIN. Rather, on this record, the cellmate appears to have maintained exclusive possession and control over the PIN at all times relevant to this case.

The state nevertheless argues that, "by taking over the call, defendant used, or took over use of, [the cellmate's] PIN," and therefore "appropriated" that PIN within the meaning of the term as used by the Supreme Court in *Medina*. That is so, the state argues, because

---

[2] To the extent that the PIN could be considered the "personal identification of" the jail or Telmate—an argument the state has intimated but never fully articulated on appeal—we would similarly conclude that there is insufficient evidence that *defendant* "appropriated" the PIN from either entity.

"use of the PIN did not necessarily end after the initiation of the call. Rather, a factfinder reasonably could have determined from the evidence that the PIN provided authorization that continued for the duration of a call, beyond its mere initiation, and that by taking over the call, defendant took over use of the PIN."

That argument is unpersuasive because, even if defendant "appropriated" the *telephone call* by taking it over from his cellmate, it does not follow that defendant therefore appropriated the *PIN* that was required to initiate the telephone call, much less converted that PIN to his own use within the meaning of ORS 165.800. Rather, defendant's cellmate gave defendant access to a benefit that the cellmate's use of his own personal identification provided him. Defendant did not appropriate that personal identification, just as a person who sits down in a friend's living room to watch a movie on an online video streaming service with the friend does not appropriate the personal identification that the friend used to log in to her account, such as her email address.

In sum, we conclude that, to "appropriate" the personal identification of another person, in the context of identity theft, a defendant must take, acquire, or claim that personal identification by possessing or controlling it without the consent or permission of the person it identifies.[3] Here, defendant and his cellmate worked together to deceive the jail regarding defendant's call, and, in doing so, defendant violated jail policy. There is no evidence in this record, however, from which a rational trier of fact could find that defendant committed identity theft by appropriating his cellmate's PIN or otherwise by "convert[ing] to [his] own use the personal identification of another person." Therefore, the state presented insufficient evidence of the crime of identity theft,

---

[3] We recall that the test announced in *Medina* had two conjunctive parts: "to convert another person's personal identification to his or her own use, a defendant must take, appropriate, or somehow divest the other person of their personal identification *and*, with the requisite intent, *use that personal identification for the defendant's own purposes.*" *Medina*, 357 Or at 271 (emphasis added). Because we conclude that there was insufficient evidence that defendant "appropriated" the personal identification, and, as previously discussed, the state makes no argument that defendant took or otherwise divested the cellmate of his identification, we do not reach the second prong of that test.

and the trial court erred in denying defendant's motion for judgment of acquittal.

Conviction for identity theft reversed; remanded for resentencing; otherwise affirmed.