# Illinois Official Reports

## Appellate Court

---

### *People v. Bensen*, 2017 IL App (2d) 150085

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BEVERLY BENSEN, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0085 |
| Filed<br>Rehearing denied | August 4, 2017<br>September 7, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 13-CF-757; the Hon. Daniel B. Shanes, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, Jessica W. Arizo, and Yasemin F. Eken, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Lawrence M. Bauer, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion.<br>Justices Burke and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant, Beverly Bensen,[1] appeals her conviction of aggravated identity theft (720 ILCS 5/16-30(b)(1) (West 2012)) following a jury trial in the circuit court of Lake County. Defendant was also convicted of one count of theft (720 ILCS 5/16-1(a)(1)(A) (West 2012)) and two counts of financial exploitation of an elderly person (720 ILCS 5/17-56(a) (West 2012)). Those convictions were merged with the aggravated-identity-theft conviction. We reverse the conviction of aggravated identity theft and remand with instructions to reinstate the convictions of theft and financial exploitation of an elderly person and to sentence defendant on those convictions.

¶ 2                                          I. BACKGROUND

¶ 3        The victim, John Cuneo, Jr., was approximately 80 years old when he hired defendant as his personal secretary in September 2011. He later also made her his office manager. The nature of Cuneo's business was not made clear in the record but he owned the "Hawthorn Corporation," which was headquartered in Grayslake, Illinois. In the winter, Cuneo lived in Florida.

¶ 4        One of defendant's duties was to pay Cuneo's corporate and personal bills. Defendant examined the bills and then made out the checks. She presented the checks for Cuneo's signature. Different checking accounts were used, depending upon the nature of each bill.

¶ 5        Cuneo furnished defendant with an American Express credit card that was to be used only for corporate business. The credit card account, ending in 91008, was in the names of both defendant and the corporation. The card that was issued to defendant bore a number that ended in 14611, and that number identified defendant as the cardholder.

¶ 6        In December 2012, following a telephone call from his bank, Cuneo retained a retired police detective, Michael Aiardo, to investigate defendant's possible misuse of the American Express card beginning the previous May. On March 21, 2013, Aiardo's investigation caused the Lake County State's Attorney to charge defendant in an information with one count of aggravated identity theft (count I), four counts of financial exploitation of an elderly person (counts II-V), and one count of theft (count VI). At trial, the parties and the judge agreed to submit only two verdict forms pertaining to the offense of financial exploitation of an elderly person, as two of the counts were duplicates.

¶ 7        Count I alleged that defendant knowingly "used personal identifying information of Cuneo, a person over the age of 60, being an account number, to fraudulently obtain goods." The matter was tried before a jury in September 2014. At trial, the State argued that defendant's unauthorized use of the American Express card with her name on it constituted the crime of aggravated identity theft.

¶ 8        The following evidence was adduced at trial. Aiardo had worked for Cuneo as a driver and personal assistant from April to October 2012. In several conversations during this period, defendant indicated to Aiardo that Cuneo signed checks without realizing how much money he

---

[1]In the record, defendant's name is also listed as "Benson." We use the name that she gave in her testimony.

had. Then, in December 2012, defendant told Aiardo that she charged some personal items on Cuneo's account, she was in trouble, and she did not know what to do.

¶ 9 Aiardo testified that Cuneo's housekeeper, Mary Johnson, who later married Cuneo, and Maria Hernandez, another employee, bought food for Cuneo's household. Aiardo had never seen defendant purchase groceries for Cuneo. Yet, in examining the bills incurred at Sunset Foods, an upscale market, Aiardo discovered that defendant had charged $3131.98 worth of groceries. Aiardo also examined Cuneo's American Express account and found that defendant charged $24,498.63 worth of goods, including makeup, perfume, clothes for her daughter, two iPads, a student computer, Xbox subscriptions, gaming systems, DVDs, and CDs. Defendant also charged a payment to the University of Illinois, where her son was a student. Defendant took her son to Cuneo's dentist and charged the dentist visit to the American Express card. Aiardo particularly noted a one-day shopping spree at Woodfield Mall in October 2012, participated in by defendant, her daughter, Johnson, and Johnson's daughter. Defendant charged thousands of dollars' worth of merchandise on that day to the American Express card.

¶ 10 The American Express records in evidence showed that, on different occasions, defendant charged over $800 in one visit to Bed, Bath & Beyond and $80 in one visit to Starbucks. There were charges from restaurants, T-Mobile, Macy's, Petco, Target, Home Depot, Godiva Chocolates, and a charge for $1665.49 from Hobby Lobby, among others.

¶ 11 Aiardo testified that defendant rented a house from Cuneo pursuant to a written lease. The rent was $1080 per month. According to the lease, defendant was to pay for the utilities. Due to defendant's financial difficulties, Cuneo reduced the rent to $540 in lieu of giving defendant a raise. Apparently, the parties executed a second lease reflecting this change. Bank records showed that defendant made one rent payment. She filled out deposit slips, indicating that other rent payments were made, but there were no corresponding deposits of money into Cuneo's account. Bank records also showed that some of defendant's ComEd bills were paid from Cuneo's account. According to Aiardo, the leases disappeared, even though all of Cuneo's other leases were in the proper filing cabinet.

¶ 12 Cuneo testified that he did not authorize defendant's Sunset Food charges. He also testified that he did not authorize defendant to charge her personal items on the American Express card. In December 2012, when Cuneo asked defendant to send the financial records to him in Florida, defendant called him and said that she had done nothing wrong, but that, if he suspected that she did, she would reimburse him. Regarding the Woodfield shopping trip, Cuneo authorized Johnson's purchases for Johnson and her daughter, but not defendant's purchases for her and her daughter.

¶ 13 Defendant testified that Cuneo authorized every charge, including the Sunset Foods charges. Defendant justified the food purchases as relating to her duties, as she had to take over many responsibilities that used to be done by others. According to defendant, Johnson, with Cuneo's permission, authorized defendant's purchases during the Woodfield outing. Defendant testified that the two iPads that she purchased were for business purposes. She further testified that Cuneo forgave her rent obligation when she told him that her financial straits were dire. According to defendant, Cuneo also authorized her to charge her son's dentist visit. Defendant claimed that, as a single mother, she could not afford a dentist. She pointed out that Cuneo was worth "hundreds of millions." Defendant admitted that she disguised the amounts of the monthly American Express bills by getting weekly balances online and presenting those to Cuneo for payment. On cross-examination, when the prosecutor asked her

- 3 -

why she kept the two iPads after her employment was terminated, defendant stated that she kept them for "safekeeping." Defendant had no explanation for why the leases went missing, even though she was the office manager and no other leases were missing. She testified that the utilities for her house were never in her name and that Aiardo had them put in her name after she was fired.

¶ 14   Defendant's daughter, Tiffany Bensen, testified that she thanked Cuneo for all of the purchases from the Woodfield spree and that he waved her off, as if approving them.

¶ 15   The State offered, without defendant's objection, non-Illinois Pattern Jury Instructions relating to the charge of aggravated identity theft. The instructions omitted the mental state of knowledge (see 720 ILCS 5/16-30(a)(1) (West 2012)) and the definition of knowledge. The jury found defendant guilty of all charges. The court granted defendant's posttrial motion in part and reduced the class of felony associated with each conviction. Finding that defendant fraudulently obtained more than $300 from Cuneo, the court reduced the conviction of aggravated identity theft from a Class 1 felony to a Class 2 felony, reduced the theft conviction to a Class 3 felony, and reduced the financial-exploitation convictions to their "appropriate classifications." According to section 17-56(b) of the Criminal Code of 2012 (720 ILCS 5/17-56(b) (West 2012)), the appropriate classification is a Class 3 felony. The court merged the theft and financial-exploitation convictions into the aggravated-identity-theft conviction and sentenced defendant to 24 months' probation, 18 months' periodic imprisonment, and 100 hours of public service. The court also ordered defendant to pay restitution in the amount of $6383.18. Defendant filed a timely appeal.

¶ 16                                     II. ANALYSIS

¶ 17   Defendant contends that she was not proved guilty of aggravated identity theft beyond a reasonable doubt because the State failed to prove that she used the personal identifying information of "another person." In the alternative, defendant asserts that she is entitled to a new trial because the jury instructions on aggravated identity theft omitted the mental state required to commit that offense.

¶ 18   To sustain a conviction, the State must prove every element of an offense beyond a reasonable doubt. *People v. Steele*, 2014 IL App (1st) 121452, ¶ 20. When a defendant challenges the sufficiency of the evidence, the reviewing court must determine whether, viewing all of the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 19   A person commits aggravated identity theft when he or she commits identity theft against a person 60 years or older. 720 ILCS 5/16-30(b)(1) (West 2012). A person commits identity theft when he or she knowingly uses any personal identifying information of "another person" to fraudulently obtain credit, money, goods, services, or other property. 720 ILCS 5/16-30(a)(1) (West 2012). Defendant does not dispute that Cuneo was over 60 years of age. She also does not dispute that she fraudulently obtained goods. However, defendant claims that she did not use any personal identifying information of "another person" to accomplish her schemes.

¶ 20   "Personal identifying information" includes the number assigned to a person's credit card. 720 ILCS 5/16-0.1 (West 2012). The statute does not define "another person." In this case of first impression, defendant asks us to construe "another person" as meaning that the name and

number on a credit card must identify someone other than the accused as the cardholder. We review issues of statutory construction *de novo*. *People v. Hart*, 313 Ill. App. 3d 939, 941 (2000).

¶ 21 The primary goal in construing a statute is to ascertain and give effect to the intent of the legislature. *Hart*, 313 Ill. App. 3d at 941. We achieve this goal by giving the statutory language its plain and ordinary meaning. *Hart*, 313 Ill. App. 3d at 941. Where the language is clear and unambiguous, no further aids of statutory construction will be applied. *Hart*, 313 Ill. App. 3d at 941. Dictionaries can be used to discern the ordinary and popular definitions of words. *People v. Ellis*, 296 Ill. App. 3d 862, 865 (1998).

¶ 22 Here, the facts are undisputed. The number on the American Express credit card that Cuneo furnished to defendant corresponded to defendant's name. Indeed, Aiardo referenced the number on that card to identify the goods that defendant purchased using the card.

¶ 23 Defendant contends that she used her own "personal identifying information"—her own credit card number—and that, therefore, the State failed to prove that the credit card number belonged to "another person." While the statute does not define "another person," "another" is defined as "one other than oneself." Webster's Third New International Dictionary 89 (1993). Additionally, the gravamen of the crime of identity theft is misrepresenting oneself as someone else. *People v. Montoya*, 373 Ill. App. 3d 78, 84 (2007). In *Montoya*, the defendant, who obtained employment using someone else's name and Social Security number, argued that she did not fraudulently obtain money or services because she earned the wages and insurance benefits she received as part of her employment. *Montoya*, 373 Ill. App. 3d at 80. In affirming the conviction, this court acknowledged that the defendant did not steal from her employer, but we nevertheless held that she was guilty of identity theft because she obtained her employment by misrepresenting herself as someone else. *Montoya*, 373 Ill. App. 3d at 84-85. In criminalizing identity theft, the legislature recognized the burden that misappropriating someone else's identity places on the economy. *Montoya*, 373 Ill. App. 3d at 85. In *Montoya*, we noted that the person whose identity the defendant assumed was caused numerous financial difficulties as a result of the defendant's impersonation. *Montoya*, 373 Ill. App. 3d at 85. Thus, to be guilty of identity theft, a defendant must knowingly misappropriate someone else's identity, not just obtain goods in an unauthorized manner.

¶ 24 Indeed, a defendant who uses his or her own personal identifying information to commit a crime of deception is not guilty of identity theft. In *State v. Zibulsky*, 338 P.3d 750, 754 (Or. Ct. App. 2014), the Oregon Court of Appeals reversed the defendant's conviction of identity theft where she withdrew funds from an account that she jointly owned with her father. The State contended that the defendant unlawfully appropriated her father's identity when she withdrew the funds, but the court pointed out that the defendant did not use any personal identifying information that was "not hers to use." *Zibulsky*, 338 P.3d at 754.

¶ 25 Also, a defendant who benefits from another's identity, but who does not misappropriate it, is not guilty of identity theft. In *State v. Ritter*, 380 P.3d 1160 (Or. Ct. App. 2016), the Oregon Court of Appeals reversed the defendant's conviction of identity theft, holding that the crime contemplates that the accused has acquired or claimed the "personal identification" of another person by possessing or exercising some control over it. *Ritter*, 380 P.3d at 1163. In *Ritter*, the defendant, an inmate who was prohibited from contacting his girlfriend, had a cellmate make a telephone call to the defendant's girlfriend, using the cellmate's personal identification number (PIN). *Ritter*, 380 P.3d at 1161. After the cellmate successfully placed the call, he handed the

telephone to the defendant. *Ritter*, 380 P.3d at 1161. The State argued that, by taking the telephone from his cellmate, the defendant converted the cellmate's PIN for his own use. *Ritter*, 380 P.3d at 1161. In rejecting the State's argument, the court of appeals noted that the defendant did not possess or exercise control over the cellmate's PIN. *Ritter*, 380 P.3d at 1164.

¶ 26    As the court in *Zibulsky* noted, identity theft criminalizes the use of another person's personal identification, but not one's own. *Zibulsky*, 338 P.3d at 753. As in *Zibulsky*, defendant used her own credit card number to make the unauthorized purchases. As in *Ritter*, defendant did not exercise any control over a credit card number that was issued in someone else's name.

¶ 27    Defendant relies on *State v. Cotton*, 2015-1623 (La. App. 1 Cir. 4/15/16); 194 So. 3d 69. In *Cotton*, the court held that the State failed to prove the defendant guilty of identity theft where he used a company credit card to fraudulently obtain money. *Cotton*, 2015-1623, at 2. The court reasoned that the card contained a number that uniquely identified the defendant as the cardholder; therefore, the defendant did not use the personal identifying information of *another person*, as required by the Louisiana statute. *Cotton*, 2015-1623, at 11.

¶ 28    In *Cotton*, the defendant's employer, Grady Crawford Construction (Grady), allowed the defendant the use of the credit card to purchase fuel for company vehicles only. *Cotton*, 2015-1623, at 3-4. The defendant's name and that of Grady were imprinted on the card. *Cotton*, 2015-1623, at 3. While Grady was identified by the account number under which the card was issued, the card itself contained a number that uniquely identified the defendant as the cardholder. *Cotton*, 2015-1623, at 11. The defendant used the card to fill other motorists' vehicles with fuel, and then he intimidated the motorists into giving him cash. *Cotton*, 2015-1623, at 2-3. The State argued that the defendant was guilty of identity theft because Grady was "another person" and was ultimately responsible for paying the credit card bills. *Cotton*, 2015-1623, at 9.

¶ 29    Louisiana's identity-theft statute is substantially similar to ours: "[i]dentity theft is the intentional use or possession or transfer or attempted use with fraudulent intent by any person of any personal identifying information of another person" to obtain goods. *Cotton*, 2015-1623, at 8; La. Stat. Ann. § 14:67.16(B) (2015). However, the Louisiana statute defines "another" person: " '[a]nother' refers to any other person or legal entity." *Cotton*, 2015-1623, at 10; La. Stat. Ann. § 14:2(A)(1) (2015). The court of appeal agreed with the State that Grady was identified by the account number, but it emphasized that the card itself contained a number that uniquely identified the defendant as the cardholder. The court also noted that the card required the use of a PIN, which was possibly known only by the defendant. *Cotton*, 2015-1623, at 11. Under these facts, the court concluded that the card personally identified the defendant in more ways than it did "any other person." *Cotton*, 2015-1623, at 11.

¶ 30    *Cotton* is virtually indistinguishable from our case. Where there is no Illinois authority on a particular issue, we may look to the decisions of courts of foreign jurisdictions to provide persuasive authority for our analysis. *In re Estate of Zenkus*, 346 Ill. App. 3d 741, 746 (2004). In our case, defendant was charged with "knowingly using the personal identifying information of Cuneo, being his account number." As in *Cotton*, both defendant and Cuneo's corporation were on the American Express account, but the credit card that defendant used to fraudulently obtain goods identified defendant as the cardholder. Put simply, when defendant charged her unauthorized purchases, she used the business credit card issued in her own name. Thus, she did not misrepresent herself as someone else.

¶ 31    Indeed, the State concedes the correctness of this analysis. Nevertheless, the State contends that defendant's use of Cuneo's checking account numbers to later pay for the fraudulent charges constituted aggravated identity theft. The evidence showed that defendant prepared the checks and presented them to Cuneo for his signature. We need not decide whether that activity satisfies the elements of identity theft because the State did not proceed on that theory at trial. The State argued to the court in pretrial motions, and to the jury, solely that defendant committed identity theft by exceeding her authority when she used the credit card for personal purchases. We cannot consider the State's alternative argument, as it violates due process for the State to change its theory of prosecution on appeal. *People v. Crespo*, 203 Ill. 2d 335, 345 (2001). Accordingly, we reverse defendant's conviction of aggravated identity theft. We remand this cause with instructions to reinstate the convictions of theft and financial exploitation of an elderly person, all Class 3 felonies, and to sentence defendant on those convictions. In light of our holding, we do not reach defendant's contention regarding the jury instructions.

¶ 32                                   III. CONCLUSION

¶ 33    For the reasons stated, we reverse defendant's conviction of aggravated identity theft, and we remand for the circuit court of Lake County to reinstate the convictions of theft and financial exploitation of an elderly person and to sentence defendant on those convictions.

¶ 34    Reversed and remanded.