Argued and submitted April 21, 2015; in Case Number 20-12-18630 reversed on Count 3, reversed and remanded on Counts 1 and 2, remanded for resentencing, otherwise affirmed; in Case Number 20-13-03790, affirmed August 31, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JASON MATTHEW BOWEN,
*Defendant-Appellant.*

Lane County Circuit Court
201218630, 201303790;
A153995 (Control), A153997

380 P3d 1054

Suzanne B. Chanti, Judge.

Andrew D. Robinson, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Greg Rios, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Tookey, Judge.

**TOOKEY, J.**

In this consolidated criminal appeal, defendant appeals two judgments of conviction, raising multiple assignments of error.[1] We write only to address defendant's first, second, and seventh assignments of error, and reject his remaining assignments without discussion. In his first and second assignments of error, defendant argues that the trial court erred by denying defendant's motions for judgment of acquittal on two counts of identity theft (Counts 3 and 4). In his seventh assignment of error, defendant argues that the trial court plainly erred by failing to *sua sponte* instruct the jury that 10 or more jurors needed to concur on whether defendant was guilty of each count as a principal or as an aider and abettor. For the reasons that follow, in case number 20-12-18630, we reverse Count 3; reverse and remand Counts 1 and 2; remand for resentencing; and otherwise affirm. In case number 20-13-03790 we affirm.

## I. WHAT CONSTITUTES A "TRANSFER" FOR PURPOSES OF ORS 165.800(1)

We begin with defendant's first and second assignments of error, in which he asserts that the trial court erred when it denied his motions for judgment of acquittal on two counts of identity theft. Both assignments of error present the same legal question—whether the trial court's rulings were based on a proper interpretation of the term "transfers" in ORS 165.800(1). "A trial court's interpretation of a statute is reviewed for legal error." *State v. Thompson*, 328 Or 248, 256, 971 P2d 879, *cert den*, 527 US 1042 (1999). *See State v. Ritter*, 280 Or App 281, 380 P3d 1160 (2016) (where a trial court's denial of a motion for judgment of acquittal centers on the meaning of the statute defining the offense, the issue is one of statutory interpretation). After we settle the legal issue of the proper interpretation of the term "transfers" in ORS 165.800(1), we view "the evidence in the light most favorable to the state" to determine whether a "rational trier of fact could have found that the essential elements of the crime had been proved beyond a reasonable doubt." *State v. Paragon*, 195 Or App 265, 267, 97 P3d 691 (2004)

---

[1] Case numbers 20-12-18630 and 20-13-03790 were consolidated for trial.

(citing *State v. Rose*, 311 Or 274, 281, 810 P2d 839 (1991)). In accordance with that standard, we state the facts in the light most favorable to the state. *Id.*

A. *Factual Background*

The victim returned from running errands on July 31, 2012, to discover that someone had broken into his house in Lane County and stolen property worth about $30,000, including a credit card and jewelry. The victim had been away from his house for roughly 45 minutes. When he arrived home, the victim noticed that the back door of his house was "all busted up," his belongings were "scattered all over," and his safe had been broken into. The victim reported the crime at 12:03 p.m.

That same day, at about 12:00 p.m., defendant, accompanied by Seaward, made a purchase at a Kohl's store with the credit card that was stolen from the victim's home. In completing the purchase, defendant swiped the credit card at the sales counter. At 12:56 p.m., defendant, still accompanied by Seaward, sold some of the jewelry that had been stolen from the victim's home to a business called Gold Buyers. At 3:27 p.m., defendant and Seaward entered a Macy's department store and picked out some items. Defendant left the store as Seaward was purchasing the items with the victim's stolen credit card. Seaward completed the purchase by swiping the credit card at the sales counter. At 5:15 p.m., defendant sold more of the stolen jewelry to a second-hand store called Your Place. Two days later, on August 2, defendant sold more of the victim's jewelry at Eugene Coin and Jewelry.

In case number 20-12-18630, defendant was charged with one count of burglary in the first degree (Count 1) and one count of aggravated theft in the first degree (Count 2) for the break-in and theft of items from the victim's home, two counts of identity theft (Counts 3 and 4) for the use of the victim's credit card at Kohl's and Macy's, and two counts of first-degree theft (Counts 5 and 6) for selling jewelry that had been stolen from the victim's home to Gold Buyers and Your Place. In case number 20-13-03790, defendant was charged with one count of first-degree theft for selling more of the victim's jewelry to Eugene Coin and Jewelry.

The first identity theft charge, Count 3, alleged that defendant, "did unlawfully, with the intent to deceive or defraud, transfer personal identification of [the victim] at the Kohl's store." Count 4 alleged that defendant, "did unlawfully, with the intent to deceive or defraud, transfer personal identification of [the victim] at the Macy's store." At trial, defendant moved at the close of the state's case for judgment of acquittal on the identity theft charges. Defendant disputed the meaning of the term "transfers" in the identity theft statute, ORS 165.800(1).[2] Defendant argued that the "dictionary talks about transfer being defined as conveying or taking over legal title or right. And I submit that the evidence does not support a transfer in this case. A swiping [of a credit card] * * * is a use of a credit card, not a transfer." The state countered that, when a person swipes a credit card as part of a transaction, "an electronic system conveys over the particular credit card number * * * into an account billing system, then that is a transfer. It's not just a—some arbitrary swipe."[3]

The trial court denied defendant's motion for judgment of acquittal, stating that "a person commits the crime of identity theft if that person transfers to the person's own use" the credit card of another person. It ruled that "the evidence suggests that that's exactly what defendant did. He transferred to his personal use the credit card number of the victim and he used it to buy things with it." Additionally, at the close of trial, defendant renewed his motion for a judgment of acquittal without further argument and the trial court denied the renewed motion for the same reason that it had denied the earlier motion.

A jury found defendant guilty of all of the charged crimes. In case number 20-12-18630, the jury found

---

[2] ORS 165.800(1) provides, in part: "A person commits the crime of identity theft if the person, with the intent to deceive or to defraud, * * * transfers * * * the personal identification of another person." Additionally, "personal identification" includes "a credit card account." ORS 165.800(4)(b)(H).

[3] On appeal, the state argues that "'transfers' encompasses handing a stolen credit card to a store clerk for processing." We decline to reach that argument because it was never made at trial; the state's argument at trial was that swiping the credit card was a "transfer." *See Outdoor Media Dimensions, Inc. v. State of Oregon*, 331 Or 634, 660, 20 P3d 180 (2001) (we will not consider an alternative basis for affirmance "if the losing party might have created a *different* record below" (emphasis in original)).

defendant guilty of burglary in the first degree (Count 1), aggravated theft in the first degree (Count 2), two counts of identity theft (Counts 3 and 4), and two counts of first-degree theft (Counts 5 and 6). The convictions on Counts 5 and 6 were merged with the conviction on Count 2, aggravated theft in the first degree. In case number 20-13-03790, defendant was found guilty of one count of theft in the first degree, and that conviction was also merged with the conviction for Count 2, aggravated theft in the first degree, in case number 20-12-18630.

On appeal, defendant renews his argument that the legislature did not intend the term "transfers," as it is used in ORS 165.800(1), to include tendering a credit card of another in the course of making a purchase. The state responds, contending that the plain meaning of the word "transfer" in ORS 165.800(1), read in the greater context of the statute, reveals that the legislature intended that the term "transfers" would cover such an unauthorized use of another person's credit card.

B. *Statutory Interpretation of "Transfers" Under ORS 165.800(1)*

As noted above, "a trial court's interpretation of a statute is reviewed for legal error." *Thompson*, 328 Or at 256. When we interpret a statute, "[w]e ascertain the legislature's intentions by examining the text of the statute in its context, along with relevant legislative history, and, if necessary, canons of construction." *State v. Cloutier*, 351 Or 68, 75, 261 P3d 1234 (2011) (citing *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009)).

We start with the statutory text because it is "the best evidence of the legislature's intent." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). ORS 165.800(1) provides: "A person commits the crime of identity theft if the person, with the intent to deceive or to defraud, obtains, possesses, transfers, creates, utters or converts to the person's own use the personal identification of another person." The term "transfers" is not statutorily defined so we look to dictionary definitions to ascertain the plain meaning of the term. *See Gaines*, 346 Or at 175 (using

dictionary definitions to discern the plain, natural, and ordinary meaning of terms).

We first review the various dictionary definitions presented by the parties. Considering the plain, natural, and ordinary meaning of "transfers" in this case, that term could be interpreted to encompass defendant's conduct. *See Websters Third New Int'l Dictionary* 2426-27 (unabridged ed 2002) (defining "transfer" as "to cause to pass from one person or thing to another : TRANSMIT"). Under such an interpretation, swiping a credit card would likely constitute a transfer because it would "transmit" the identifying number of a person's credit card account "from one person or thing to another." *Id.*

"Transfers" could also be interpreted more narrowly as "to make over or negotiate the possession or control of (a right, title, or property) by a legal process usu. for a consideration[.]" *Id.* Furthermore, "transfer" is defined by *Black's Law Dictionary* 1636 (9th ed 2009), as "to pass or hand over from one to another, esp. to change over the possession or control of. * * * To sell or give." *See State v. Hess*, 342 Or 647, 650, 159 P3d 309 (2007) (using *Black's* to define "stipulation" as a legal term). Under this interpretation, the transmission of the identifying number of a person's credit card account by swiping it at a terminal would likely not be a transfer. Instead, under this interpretation, to be a transfer, another person's credit card information would need to be sold, or possession or control would need to be given, to a third person for fraudulent or deceptive purposes.

As we conclude below, context dictates construing the term "transfers" in ORS 165.800(1) as selling or giving possession or control of another person's personal identification to a third person for fraudulent or deceptive purposes. Context supports that construction of the term "transfers" because there is a general assumption that "when the legislature employs different terms within the same statute, it intends different meanings for those terms." *State v. Meek*, 266 Or App 550, 556, 338 P3d 767 (2014) (internal quotation marks omitted). Additionally, "[a]s a general rule, we construe a statute in a manner that gives effect, if possible, to all its provisions." *Crystal Communications, Inc. v. Dept.*

*of Rev.*, 353 Or 300, 311, 297 P3d 1256 (2013) (citing ORS 174.010 ("[W]here there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all.")).

In ORS 165.800(1), the term "transfers" appears with five other verbs, each describing different ways of committing identity theft: "obtains, possesses, transfers, creates, utters or converts to the person's own use" the personal identification of another. Read together, those different verbs address particular acts that constitute the crime of identity theft and, as noted, we assume that the legislature used different terms in order to specify various types of acts that could constitute the crime of identity theft. If we construe "transfers" as defendant proposes, it would address the specific act of trafficking personal identification—the situation in which a person "transfers" the personal identification of another by selling or giving possession or control of that personal identification to a third person for fraudulent or deceptive purposes. That construction would "give effect to all" the particular provisions in the statute. ORS 174.010; *State v. Stamper*, 197 Or App 413, 418, 106 P3d 172, *rev den*, 339 Or 230 (2005) ("[W]e assume that the legislature did not intend any portion of its enactments to be meaningless surplusage.").

Additionally, we consider prior interpretations of the terms in ORS 165.800(1) when we are analyzing the text in its context. *Cloutier*, 351 Or at 100 ("Our analysis * * * is also informed by this court's prior construction of that statute or its predecessors."). In *State v. Medina*, 357 Or 254, 272, 355 P3d 108 (2015), the Supreme Court construed the terms in ORS 165.800(1), "utters" and "converts to the person's own use." In *Medina*, "after [the] defendant was arrested and taken to the police station, he 'was fingerprinted,'" and "falsely signed [a fingerprint card and property receipt] that government officials created for their own use and that they tendered to [the] defendant for his signature." *Id.* at 266. The defendant was indicted for identity theft for "'uttering' another person's personal identification" and the indictment also alleged that the defendant "convert[ed] to [his] own use" the personal identification of another. *Id.* at 267.

The court examined how the terms "utter" and "converts to the person's own use" are used in related statutes. *Id.* at 266-68 (citing *Cloutier*, 351 Or at 99 ("[W]e ordinarily assume that the legislature uses the terms in related statutes consistently.")). It rejected our broad interpretation of the term "utter," and concluded that the "legislature used the word 'utter' in the same sense that it had used it in the forgery statute [ORS 165.002]," and, thus, the state had to prove that the defendant "offered or tendered either of those documents to police." *Id.* at 266.[4] In light of that interpretation, the court held that the trial court could not reasonably have found that the defendant "'uttered' either the fingerprint card or the property receipt" when he signed and completed those forms because "all the record shows is that defendant falsely signed two documents that government officials created for their own use and that they tendered to defendant for his signature." *Id.* at 266-67.

Next, the court determined that "to convert another person's personal identification to his or her own use, a defendant must take, appropriate, or somehow divest the other person of their personal identification and, with the requisite intent, use that personal identification for the defendant's own purposes." *Medina*, 357 Or at 271. The court concluded that "[i]n falsely signing those two documents, defendant did not take, divest, or somehow appropriate the documents" and, thus, the trial court could not reasonably find that the defendant had converted another person's identity for his own use. *Id.* The court noted that based on the underlying conduct, the defendant "may have been guilty of forgery for

---

[4] ORS 165.007(1)(b), provides that "[a] person commits the crime of forgery in the second degree if, with the intent to injure or defraud, the person *** [u]tters a written instrument that the person knows to be forged." ORS 165.002(7) provides, in part, that, "unless the context requires otherwise *** [t]o 'utter' means to issue, deliver, publish, circulate, disseminate, *transfer* or tender a written instrument or other object to another." (Emphasis added.) To "utter" is the only way by which to commit the criminal conduct described in ORS 165.007(1)(b) and as a general prohibition it is broadly defined by ORS 165.002(7) to encompass various acts. Conversely, as we note in our discussion, ORS 165.800 uses different verbs to describe the particular acts that are meant to be covered under the statute and, consequently, the term "transfers," as it is used in ORS 165.800, describes an act that is distinct from "uttering" the personal identification of another. *See Crystal Communications, Inc.*, 353 Or at 311 ("As a general rule, we construe a statute in a manner that gives effect, if possible, to all its provisions.").

falsely signing or completing" a written instrument or "identity theft for falsely 'creating' the personal identification of another," but the state charged defendant only with uttering and converting to the person's own use. *Id*. at 267-71.

Accordingly, although the various ways to commit the offense of identity theft described in ORS 165.800(1) may have some overlap, *Medina* tends to rebut the state's argument that the various means of committing the offense must be construed as broadly as possible. The court in *Medina* noted the differences in these prohibited acts, construed the various means of committing identity theft in ORS 165.800(1) as distinct acts that can constitute the crime of identity theft, and limited the state to "the substantive allegations in the indictment." *Id*. at 267.

Our review of the legislative history supports the conclusion that the term "transfers" was included to address the particular act of trafficking personal identification—that is, the situation in which a person "transfers" the personal identification of another by selling or giving possession or control of that personal identification to a third person for fraudulent or deceptive purposes. As discussed below, that history strongly suggests that the term "transfers" was written into ORS 165.800(1) as part of an effort to harmonize that statute with a federal identity theft law that made it a federal offense for someone to "knowingly transfer[] or use[], without lawful authority, a means of identification of another person with the intent to commit, or to aid and abet, any unlawful activity that constitutes a violation of Federal Law, or that constitutes a felony under any applicable State or local law." Identity Theft and Assumption Deterrence Act of 1998, Pub L 105-318, § 3, 112 Stat 3007 (1998). The legislative history of that federal law shows that Congress intended the term "transfers" to prohibit the trafficking of identity information, and to have a meaning distinct and apart from "uses."

We begin with Oregon's identity theft law which, when first introduced to the Oregon legislature as House Bill 2623 (HB 2623), did not contain the term "transfers." Bill File, HB 2623, Feb 1, 1999. Rather, HB 2623 would have made it a crime where someone "[r]epresents that the

person is another person" and "[u]ses or attempts to use" the other person's "personal identifying information or personal identification document *** to obtain anything of value." *Id.*; *see also Medina*, 357 Or at 260-61 (describing the legislative history of ORS 165.800). During a hearing on HB 2623 in March 1999, the House Judiciary Criminal Law Committee (the committee) received testimony describing the federal Identity Theft and Assumption Deterrence Act of 1998, which had been enacted the year before. Tape Recording, House Judiciary Criminal Law Committee, HB 2623, Mar 25, 1999, Tape 105, Side A (statements of Adam Heaton and Rep Kevin Mannix).

Adam Heaton, an intern for Rep. Roger Beyer, had researched the federal legislation and testified that the "House has passed HR 4151, the Federal Identity Theft and Assumption Deterrence Act of 1998" and that it was waiting for the President's signature. *Id.* (statement of Adam Heaton). Following that testimony, committee chairman Rep. Kevin Mannix said, "So what we should do is *** look to how we can make sure that our law or our legislation blends—not that we feel directed by Congress, but we certainly would want to see if we're copacetic with whatever is being done at the national level." *Id.* (statement of Rep Kevin Mannix). Later in the hearing, Rep. Mannix added: "That measure, according to this summary, makes it *** a federal crime to knowingly possess, transfer or use, without lawful authority, a means of identification of another person with the intent to commit an unlawful act." Tape Recording, House Judiciary Criminal Law Committee, HB 2623, Mar 25, 1999, Tape 106, Side A (statement of Rep Kevin Mannix). Although the language quoted by Rep. Mannix appears to have come from a prior Senate version of the federal law, S 512, U.S. Rep. Bill McCollum, explained during the Congressional proceedings on HR 4151 that, as amended, the "language will be similar to the text of S. 512, a bill on this same subject that passed in the other body by unanimous consent" and would "delete the mere possession of personal identifying information from the offense[.]" 144 Cong Rec H9993, H9997 (Oct 7, 1998) (statement of Rep Bill McCollum); *compare* Senate Bill S 512, 105th Cong § 2 (1998) (as reported by Senate Committee on Judiciary,

July 9, 1998) (making it a crime where one "knowingly possesses, transfers, or uses, without lawful authority, a means of identification of another person") *with* Identity Theft and Assumption Deterrence Act of 1998, Pub L 105-318, § 3, 112 Stat 3007 (1998) (amending 18 USC section 1028 to make it a crime where one "knowingly transfers or uses, without lawful authority, a means of identification of another").

On May 4, 1999, following the March hearing on HB 2623, the committee stripped the identity theft provisions from HB 2623 and inserted them into a separate bill, HB 3057. Tape Recording, House Judiciary Criminal Law Committee, HB 3057, May 4, 1999, Tape 179, Side A (statement of committee counsel); *Medina*, 357 Or at 261 (describing the process as "a practice that colloquially is known as 'gutting and stuffing'"). As amended into HB 3057, the identity theft provision included, for the first time, the term "transfers" and provided, in part: "A person commits the crime of identity theft if the person, with the intent: (a) To defraud, obtains, possesses, *transfers*, creates, utters or converts to the person's own use the personal identification of another person[.]" Bill File, A-Engrossed HB 3057, May 13, 1999 (emphasis added); *Medina*, 357 Or at 261. Legislative history provides no explanation for this change in wording other than Rep. Mannix's announced intention to "make sure" that the Oregon statute "blends" with the federal identity theft law. *See Medina*, 357 Or at 266 n 7 ("[W]hen the House Judiciary Criminal Law Committee expanded the list of prohibited acts in the identity theft statute * * * no one discussed what those terms meant.").

When the Oregon legislature adopts a statute based on federal law, we may examine the legislative history of that federal law for guidance in interpreting the state statute. *PSU Association of University Professors v. PSU*, 352 Or 697, 710-11, 291 P3d 658 (2012) ("[T]his court repeatedly has stated that Oregon courts may examine federal precedent for contextual support when they construe state statutes that parallel federal law."); *see also McKean-Coffman v. Employment Div.*, 312 Or 543, 550, 824 P2d 410 (1992) (legislative history of a federal statute is persuasive in interpreting an Oregon statute based on that federal statute).

The Identity Theft Assumption and Deterrence Act of 1998 (the 1998 Act) was enacted to amend an existing statute that dealt with identity *document* fraud, 18 USC § 1028, by adding new provisions to address identity *information* fraud. S Rep No 105-274, 105th Cong, 2d Sess (1998), 4 (stating that a principle purpose of the bill was "to extend 18 USC [§] 1028, which criminalizes fraud in connection with identification documents, to cover the unlawful transfer and use of identity information").

As originally enacted, 18 USC § 1028(a) set out six subsections creating different offenses related to identity document fraud. False Identification Crime Control Act of 1982, Pub L No 97-398, 96 Stat 2009 (1982). Subsection (a)(2) made it a crime where a person "knowingly transfers an identification document or a false identification document knowing that such document was stolen or produced without lawful authority." *Id.*; 18 USC § 1028(a)(2) (1982). The House Report for the False Identification Crime Control Act of 1982 (the 1982 Act) explained in its section-by-section analysis that "[t]he second offense is the knowing transfer of an identification document * * *. This offense covers those who *traffic* in stolen or false identification, irrespective of whether consideration was received." HR Rep No 97-802, 97th Cong, 2d Sess, *reprinted in* 1982 USCCAN 3519, 3528 (emphasis added). The House Report distinguished the meaning of the phrase "the intent to *use* unlawfully" from the meaning of the phrase "the intent to *transfer* unlawfully." *Id.* at 3529 (emphases added). The report explains that "[t]he intent to use unlawfully is the intent to * * * present, display, certify, or otherwise give currency to * * * the identification document in any manner so that it would be accepted[,]" whereas "the intent to transfer unlawfully is the intent to sell, pledge, distribute, give, loan or otherwise transfer an identification in a manner forbidden by federal, state or local law." *Id.*

The 1998 Act inserted a new subsection, (a)(7), which made it a crime where a person "knowingly transfers or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, any unlawful activity * * *." Identity Theft and Assumption Deterrence Act of 1998, Pub L 105-318, § 3, 112 Stat 3007

(1998); 18 USC § 1028(a)(7) (1998). We have identified nothing in the 1998 Act or its legislative history that suggests that Congress intended the term "transfers," as used in subsection (a)(7), to have a different meaning than in subsection (a)(2). Rather, the placement of the identity theft provision among other subsections using the same term indicates the intent to maintain the same meaning of transfer that was intended by Congress in the 1982 Act. *See Barnhill v. Johnson*, 503 US 393, 406, 112 S Ct 1386, 118 L Ed 2d 39 (1992) ("Normally, we assume that the same terms have the same meaning in different sections of the same statute."); *State v. Shaw*, 338 Or 586, 603, 113 P3d 898 (2005) (same).

References to the term "transfers" in the legislative history of the 1998 Act confirm our conclusion. Those references consistently reflect that the "transfer" of personal identification refers to the trafficking of personal identification, and that the "transfer" of personal identification is something different from the "use" of personal identification. For example, U.S. Rep. Bill McCollum, stated that "unfortunately, * * * [a]t present, while the use of false identity documents is a crime, the gathering * * * and sale of personal identifying information is not * * * [and] [b]ecause of this gap in the law, law enforcement agencies can only investigate the fraud that occurs after stolen identity information is used[.]" 144 Cong Rec H9993, H9994 (Oct 7, 1998) (statement of Rep Bill McCollum). Rep. McCollum noted that, as a result,

> "[t]he Secret Service has informed the Committee on the Judiciary that if the *transfer* of personal identifiers were a crime, they would be able to prosecute those persons who *traffic* in this information and in many cases prevent the fraud that is later committed by those who buy this information from those who sell it."

*Id.* (emphases added). Additionally, Rep. Bill McCollum explained that, as introduced, the identity theft provision required a defendant to have "transferred five or more means of identification in order to prove the crime had been committed," while requiring proof of only a single use to violate the law. *Id.* at H9997. Rep. McCollum then explained that

the committee had "eliminate[d] this distinction" between the number of means of identification required to prove each act, and added that he "believe[d] that allowing even one person's identity to be sold to another person unlawfully should be punished." *Id.* Rep. McCollum noted that, "as amended, the bill * * * requires that the government prove an unlawful use or *transfer to another person* of the personal information in order to prove the crime." *Id.* (emphasis added).

In light of that legislative history, which shows that Congress intended the term "transfers," as used in 18 USC section 1028 and the Identity Theft and Assumption Deterrence Act of 1998, to mean something different from "uses," and, specifically, to prohibit the trafficking of identification documents and information, our construction of the term "transfers" in ORS 165.800(1) comports with the Oregon legislature's apparent intent to "make sure" that the Oregon law "blends" with the federal law and, as explained previously, that construction is also supported by the text and context of ORS 165.800(1).

The trial court's ruling that "a person commits the crime of identity theft if that person transfers to the person's own use" the credit card of another person, renders the phrase "converts to the person's own use" in ORS 165.800(1) "meaningless surplusage." *Stamper*, 197 Or App at 418. As construed by *Medina*, the phrase "converts to the person's use" is distinct from the term "utters" and, thus, we conclude that the phrase "coverts to the person's own use" is also distinct from the term "transfers," in that transferring another's personal identification does not include transferring the identification "to the person's own use." 357 Or at 266-71.

Therefore, as used in ORS 165.800(1), we conclude that a person "transfers" the personal identification of another by selling or giving possession or control of that personal identification to a third person for fraudulent or deceptive purposes. That construction addresses the particular harm of trafficking in personal identification—the fraud or identity theft that may be committed by third parties who obtain stolen personal identification from those who "transfer" it.

We now apply that understanding of the term "transfers" to the facts of this case. As previously noted, the state argues that defendant transferred the identifying number of the victim's credit card account two separate times.

## C.  *Count 3: Identity Theft*

With regard to the use of the stolen credit card at the Kohl's store, similar to the reasoning of the Supreme Court regarding the defendant in *Medina*, defendant may have been guilty of another prohibited act under ORS 165.800(1), but the state charged defendant only with transferring the personal identification of another. For example, the state may have been able to prove that defendant converted the credit card to his own use by "tak[ing], appropriate[ing], or somehow divest[ing]" the victim of his credit card and swiping the credit card for his own use. *See Medina*, 357 Or at 271 (describing how a person could violate ORS 165.800(1) by converting the personal identification of another to the person's own use). Or the state may have been able to prove that defendant possessed the stolen credit card at Kohl's, and was intending to make a fraudulent purchase. But, as was the case in *Medina*, the state is "limited to the substantive allegations in the indictment." *Id.* at 267.[5] Here, the evidence shows that defendant gave possession or control of the victim's credit card information to Kohl's for his own fraudulent use. Defendant did not give possession or control of the victim's credit card information to another to use to defraud the victim at Kohl's. Thus, a rational trier of fact could not reasonably find that defendant "transferred" the credit card at Kohl's under ORS 165.800(1) and, therefore, the trial court erred when it denied defendant's motion for judgment of acquittal on Count 3.

## D.  *Count 4: Identity Theft*

With regard to the use of the stolen credit card at Macy's, the evidence shows that after defendant used the

---

[5] ORS 165.055 addresses the specific act defendant committed when he swiped the stolen credit card to pay for items: "A person commits the crime of fraudulent use of a credit card if, with the intent to injure or defraud, the person uses a credit card for the purpose of obtaining property or services with the knowledge that *** [t]he card is stolen[.]" *See Medina*, 357 Or at 267 ("[D]efendant may have been guilty of forgery for falsely signing or completing the fingerprint card and the property receipt.").

credit card to make the purchase at Kohl's, Seaward possessed the credit card at Macy's. Additionally, both defendant and Seaward entered Macy's, picked out items, and then defendant left the store as Seaward was purchasing the items with the credit card. A rational trier of fact could reasonably infer from that evidence that defendant gave Seward possession of the victim's stolen credit card after he used it at Kohl's so Seward could use it to defraud the victim at Macy's. Thus, the trial court did not err when it concluded that a rational trier of fact could reasonably find that defendant "transferred" the credit card to Seward under ORS 165.800(1) and, therefore, it correctly denied defendant's motion for judgment of acquittal with respect to Count 4.

## II.  JURY CONCURRENCE INSTRUCTION

Next, we consider defendant's seventh assignment of error. As noted, in his seventh assignment, defendant argues that the trial court plainly erred by failing to *sua sponte* instruct the jury that 10 or more jurors needed to concur on whether defendant was guilty of each charge as the principal or as an aider and abettor.

Prior to closing arguments, the trial court reviewed the proposed jury instructions with the parties. After reviewing the instructions, defendant told the court, "I don't see any errors or omissions." The trial court then gave the instructions to the jurors on the elements of each charge in terms of defendant's liability as the principal. Additionally, the trial court included instructions for accomplice liability and aiding and abetting. However, the trial court did not instruct the jurors that they were required to concur on whether defendant was guilty as a principal or an accomplice.

Recent case law on jury concurrence instructions guides our analysis in this case. In *State v. Gaines*, 275 Or App 736, 365 P3d 1103 (2015), we addressed the availability of plain error review for failing to *sua sponte* instruct the jury that 10 or more jurors needed to concur on whether defendant was guilty as the principal or as an aider and abettor. As was the case in *Gaines*, in this case, after defendant's trial, the Supreme Court issued *State v. Phillips*, 354 Or 598, 606, 317 P3d 236 (2013), explaining that "the

elements necessary to prove liability as an aider and abettor ordinarily will not be coextensive with the elements necessary to prove liability as a principal" and, thus, "[i]t follows that 10 jurors usually will have to agree on the elements necessary to prove that a defendant is liable for aiding and abetting another person's commission of a crime."[6]

Accordingly, after *Phillips* and *Gaines*, it is error to not give a jury concurrence instruction if there are competing theories of liability as to whether a defendant was the principal or an aider and abettor. However, for an error to qualify for plain error review,

> "(1) it must be legal error; (2) it must be 'apparent,' such that 'the legal point is obvious, not reasonably in dispute'; and (3) it must appear on the face of the record, such that 'we need not go outside the record or choose between competing inferences to find it, and the facts that compromise the error are irrefutable.'"

*State v. Jury*, 185 Or App 132, 135, 57 P3d 970 (2002), *rev den*, 335 Or 504 (2003) (quoting *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990)). "Error, in general, must be determined by the law existing at the time the appeal is decided, and not as of the time of trial." *Id.* at 136.

With regard to the first and third requirements for an error to qualify for plain error review, in *Gaines* we noted that "the Supreme Court and this court have generally held that 'the question of what must be included in a jury instruction is a question of law, and what was or was not included is readily determined by examining the instructions given.'" 275 Or App at 746 (quoting *State v. Lotches*, 331 Or 455, 472, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001)). Thus, whether the trial court needed to give a concurrence instruction presents a question of legal error and we need not go outside of the jury instructions to find the facts that constitute the error because, as noted, the court did not give a concurrence instruction. As such, the first and third requirements for the error to qualify for plain error

---

[6] "Put differently, if the state seeks to hold a defendant liable either as the principal or as an aider and abettor *** the trial court should instruct the jury that at least 10 jurors must agree on each legislatively defined element necessary to find the defendant liable under one theory or the other." *Phillips*, 354 Or at 606.

review are met because the jury instruction presents a question of legal error and we need not look outside of the record to find the facts.[7]

However, we still must determine whether the error is apparent, such that the legal point is obvious and not reasonably in dispute for the error to qualify for plain error review. In *Gaines*, with regard to the second requirement for plain error review, we held that "[a]fter *Phillips*, it is 'obvious' that, when the state advances competing theories of liability based on a defendant's acts as [the] principal or as an aider and abettor * * * a jury must be instructed that at least 10 jurors must agree that the defendant is liable under one theory or the other." *Id.* at 748. Accordingly, we examine each count, except Count 3,[8] and determine whether "[t]he instructions given in this case, combined with the evidence presented, would have allowed fewer than the required number of jurors to find defendant liable as a principal, and fewer than the required number of jurors to find him liable as an accomplice." *Id.*

A.   *Counts 1 and 2: Burglary and Aggravated Theft*

The instruction for burglary (Count 1) stated that "the state must prove beyond a reasonable doubt * * * [that defendant] entered or remained unlawfully in the premises described in the charge." The instruction for aggravated theft in the first degree (Count 2) stated that "the state must prove beyond a reasonable doubt * * * [that defendant], with the intent [to] appropriate property to himself took property and jewelry from the owner." During its deliberations, the jury submitted two questions to the court concerning aiding-and-abetting a burglary. First, the jury asked, "For burglary in the first degree, does the defendant have to enter or remain in the dwelling? Or, does the rule regarding aid or abet apply, or criminal liability for conduct of another person apply?" The court responded that "[t]he instruction regarding liability for conduct of another person and aid or

---

[7] "[F]or us to decide whether instructional error is plain error, our analysis is normally limited to determining whether the error was 'obvious,'" *i.e.*, apparent. *Gaines*, 275 Or App at 746.

[8] We do not analyze Count 3 here because we have already determined that the trial court erred when it denied defendant's motion for judgment of acquittal.

abet apply to each count." Next, the jury asked, "In regard to burglary in the first degree, in aid or abet, does the word procure mean procuring the stolen goods, or does it mean procuring (funding or contracting) the crime of burglary?" The court responded that "there is no further definition." As noted above, the jury found defendant guilty of burglary and aggravated theft in the first degree, but there is no indication on the verdict form as to whether defendant was liable as the principal or as an aider and abettor for either count.

With regard to defendant's convictions for burglary and aggravated theft in the first degree, for the break-in and theft of items valued at over $10,000 from the victim's home, the state presented no evidence as to whether it was defendant or Seaward who actually broke into the house and stole the items. The state argued that the jury could infer from the short period of time between the break-in and when defendant and Seaward began using the stolen credit card and selling the stolen items, that defendant was involved in the burglary. Specifically, in closing argument, the state told the jury, "I can't tell you if this defendant was the one who actually went into the house," but "I don't even have to show that he actually entered the house, * * * just that he was a participant in that particular—in that particular burglary." The state continued, arguing that "it's clear from the surrounding evidence that he was an active participant in that burglary. There's a principal and an aider and abettor."

In light of the instructions given and the state's theory of defendant's liability, the jury should have been instructed that at least 10 jurors must agree that defendant was liable as the principal or as an aider and abettor, as the instructions permitted the jury to find defendant guilty as the principal and as an aider and abettor. Thus, the instructional error is apparent, such that the legal point is obvious and not reasonably in dispute with regard to Counts 1 and 2, and is reviewable as plain error.

B. *Count 4: Identity Theft*

With regard to defendant's conviction on Count 4, identity theft for transferring the personal identification for use at the Macy's store, the instruction stated that "the state

must prove beyond a reasonable doubt \* \* \* [that defendant], acting with the intent to deceive or defraud, transferred the personal identification of [the victim] at Macy's store." The evidence and arguments could only reasonably support one theory of liability: that defendant acted as the principal when he transferred the stolen credit card to Seaward for her to use at Macy's. The instructional error with regard to Count 4 is not apparent, such that the legal point is obvious and not reasonably in dispute and, thus, not reviewable as plain error.

C.   *Counts 5 and 6: Theft in the First Degree*

With regard to Counts 5 and 6 for first-degree theft, the instruction for Count 5 stated that "the state must prove beyond a reasonable doubt \* \* \* [that defendant], with the intent to appropriate property to himself disposed of the property owned by [the victim], by selling the property at the Gold Buyers business; and \* \* \* [defendant] knew or believed the property was the subject of theft." The instructions for Count 6 were identical, except that the jury had to find the defendant guilty beyond a reasonable doubt for "selling the property at Your Place business." The evidence and arguments did not present competing theories of defendant's liability as a principal or aider and abettor. The charges were based on defendant's sale of jewelry that he knew was stolen. The evidence shows that, for Count 5, defendant was identified by the manager at Gold Buyer's as the seller of the stolen property and that for Count 6 he was identified by the owner of Your Place as the seller of the stolen jewelry. Thus, the only possible theory for those counts is that defendant was acting as the principal when he sold the stolen jewelry. Accordingly, any error with regard to Counts 5 and 6 is not apparent, such that the legal point is obvious and not reasonably in dispute and, thus, not reviewable as plain error.

D.   *Case Number 20-13-03790: Theft in the First Degree*

Finally, in case number 20-13-03790, for a single count of first-degree theft, the instruction was identical to Counts 5 and 6 above, except that the state had to prove that defendant sold "the property at Eugene Coin and Jewelry business." The owner of Eugene Coin and Jewelry identified defendant as the person who sold the stolen jewelry. Thus,

as with Counts 5 and 6 above, there were not competing theories of liability, and the evidence shows that defendant was acting as the principal when he sold the stolen jewelry. Any error with regard to the first degree theft charge in case number 20-13-03790 is not apparent, such that the legal point is obvious and not reasonably in dispute and, thus, not reviewable as plain error.

## E.   *Exercise of Discretion*

Given our conclusion that the claimed error for Counts 1 and 2 is reviewable as plain error, we must decide whether to exercise our discretion to correct the error. When deciding whether to exercise our discretion to correct a plain error we consider

> "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way, *i.e.*, whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error."

*Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991). We also consider whether the defendant may have made a strategic choice to not object to the instructional error. *State v. Fults*, 343 Or 515, 523, 173 P3d 822 (2007).

The state argues that we should not exercise our discretion to correct any error because defendant encouraged the error by "representing that he noted no 'errors or omissions' in the proposed instructions." Defendant contends that we should exercise our discretion in light of the convictions being for serious felonies, the lengthy sentence imposed, and defendant's interest in a fair trial. In *Gaines*, we chose to exercise our discretion to correct the trial court's plain error when the "defendant was convicted of second-degree robbery—a serious felony—and sentenced to 70 months' imprisonment," a sufficient number of jurors may not have concurred on a single theory of liability, and because "at the time of defendant's trial, whether a jury concurrence instruction was required when the state presented

competing theories of liability was not as certain as it was after *Phillips*." 275 Or App at 750-51.

For the reasons articulated in *Gaines*, we exercise our discretion to correct the error on Counts 1 and 2. Here, defendant was convicted of two felonies—burglary and first-degree aggravated theft—and sentenced to 26 months' imprisonment for the burglary conviction and 52 months for the aggravated theft conviction. As noted above, the state's theory of liability rested on the inference that defendant possessed the stolen items shortly after the burglary and, thus, "we are not persuaded that a sufficient number of jurors concurred on a single theory of liability." *Id*. at 750. Additionally, as in *Gaines*, defendant's jury instructions were given on March 6, 2013, before *Phillips* was decided on December 27, 2013, and "we can discern no plausible inference that defense counsel strategically elected to not seek such an instruction on the off chance that the Supreme Court would later make the requirement for such an instruction 'obvious' before our decision in defendant's appeal." *Id*. at 751.[9]

In Case Number 20-12-18630 reversed on Count 3; reversed and remanded on Counts 1 and 2; remanded for resentencing; otherwise affirmed. In Case Number 20-13-03790, affirmed.

---

[9] In *Gaines*, we addressed "any possible inference that [the] defendant made a strategic choice to not request a concurrence instruction in our analysis of whether to exercise our discretion to correct any error." 275 Or App at 746-47 n 3 (citing *Fults*, 343 Or at 520 (opting to analyze potential strategic choice by defendant as part of decision of whether to exercise discretion to correct plain error, as opposed to whether there was any error at all)).